## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CARRIE BAKER**, | : | CIVIL ACTION |
| | : | |
| *Plaintiff*, | : | |
| | : | NO. |
| v. | : | |
| | : | |
| **GREEN THUMB INDUSTRIES INC.**, | : | |
| | : | |
| *Defendant.* | : | **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Carrie Baker ("Plaintiff" or "Baker"), by and through undersigned counsel, files the within Complaint against her former employer, Green Thumb Industries Inc. ("Defendant" or "GTI"), and avers as follows:

### Preliminary Statement

"*You don't fit in with the company culture.*"

This is what Baker's manager told her—shortly after starting her employment with GTI at its newly-opened medical marijuana dispensary located in Steelton, Pennsylvania. Indeed, according to this manager, GTI was looking to hire "young, single men" (like him). While GTI touted a diversity plan to secure permission from the Commonwealth to sell medical marijuana, after securing its permit, and soon after opening for business, GTI began separating several employees who helped it satisfy these very same diversity goals. The message was clear: Now that it was open

for business, GTI was interested in employing a certain "type" of employee—and that type did not include someone like Baker.

To be sure, and despite GTI's stereotypical misgivings, medical marijuana is an issue near and dear to Baker, who became committed to—and advocated for—the cause after watching her best friend suffer and die from a rare form of cancer. Baker wrote her graduate school thesis on the topic of aligning state and federal laws relating to the use and sale of medical marijuana. Baker is a resident of Steelton, and when she learned that GTI would be opening a RISE dispensary in her town, she jumped at this chance to help make a difference in her community.

Unfortunately, being a woman in her mid-fifties, Baker's goals did not align with GTI's vision of who, apparently, it *truly* wanted to employ and, by extension, serve as the face of the company. As if to prove that point, early in her employment, and despite the fact she was objectively more qualified for a particular promotional opportunity than a substantially younger, male co-worker, GTI chose to award the position (Shift Supervisor) to him without even giving Baker the opportunity to apply. This discriminatory decision set the tone for the balance of Baker's tenure at GTI.

Given the nakedly discriminatory nature of this employment decision, Baker filed a complaint with the Pennsylvania Human Relations Commission. Once GTI learned of this, Baker—who had never received a disciplinary write-up in her life—

began to receive unfair, unfounded, and wholly disproportionate disciplinary actions that had no basis in fact and had nothing to do with the performance of her job duties, but rather, were designed solely to impede her upward progress within a company that was clearly not looking to advance the interests of a middle-aged woman who did not "fit the culture."

After months of enduring a constant barrage of retaliatory harassment from GTI in response to the filing of her PHRC complaint, Baker simply had no choice but to terminate her employment with GTI (i.e., constructive discharge). Indeed, immediately prior to her termination, Baker was threatened with discharge and was told (yet again) that she was being "investigated" for her "negative attitude." Further, Baker learned that another employee had recently received termination documents with Baker's name (not the employee's name) on them. Clearly, the writing was on the wall, and Baker, like any reasonable employee, was compelled to resign due to GTI's discriminatory and retaliatory actions. Subsequent to Baker's constructive discharge, and upon information and belief, GTI replaced her with a substantially younger employee, i.e., someone who, in GTI's estimation, was a "better fit" with the company's culture.

As set forth herein, GTI's actions violate a variety of employment statutes, including Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. § 621,

*et seq.* ("ADEA"), and the Pennsylvania Human Relations Act, 43 P.S. 951, *et seq.* ("PHRA").

## Jurisdiction

1.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (relating to Plaintiff's federal claims) and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) (relating to Plaintiff's state law claims).

## Venue

2.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because, at all times relevant to the allegations herein, Plaintiff was employed by Defendant at a location in Steelton, Pennsylvania, i.e., within the Middle District of Pennsylvania.

## Conditions Precedent

3.      In October 2018, while she was still employed, Baker filed a complaint against GTI with the Pennsylvania Human Relations Commission ("PHRC"), No. 201801167, alleging both age- and sex-based discrimination in connection with a promotion that had been unfairly awarded to a less qualified, substantially younger male co-worker ("PHRC Complaint"). The PHRC Complaint was dual filed with the U.S. Equal Employment Opportunity Commission ("EEOC").

4.      Upon filing the PHRC Complaint, Baker's work environment began to deteriorate further due to GTI's retaliatory actions (taken as a result of her filing the PHRC Complaint), culminating in her constructive discharge on June 7, 2019, and

resulting in the filing of a Charge of Discrimination against GTI with the U.S. Equal Employment Opportunity Commission ("EEOC") on or about February 11, 2020, No. 530-2020-00521, which raised additional allegations of age discrimination and retaliation ("EEOC Charge"). The EEOC Charge was dual filed with the PHRC.

5.     On or about June 27, 2022, the EEOC closed its investigation into both the PHRC Complaint and EEOC Charge—expressly noting that it was not making a determination as to the claims raised by Baker—and issued Baker her Notice of Suit Rights.

6.     This Complaint is being filed within ninety days of Baker's receipt of the Notice of Suit Rights from the EEOC, and more than one year has passed since the filing of her PHRC Complaint. Accordingly, Baker has fully complied with all prerequisites to jurisdiction in this Court under the relevant statutes.

## Parties

7.     Baker is an adult individual residing in Steelton, Pennsylvania. At all times relevant to the allegations set forth herein, she was employed by GTI at its RISE medical marijuana dispensary, which is also located in Steelton.

8.     GTI is a cannabis consumer packaged goods company and retailer with headquarters in Chicago, Illinois. GTI owns and operates a number of retail cannabis stores under the name "RISE" in a variety of states, including Pennsylvania, one of which is the location where Baker worked. At all times relevant to the allegations

set forth herein, GTI acted by and through its agents, servants, and employees, each of whom acted in the course and scope of their employment with and for GTI.

## Facts

9.     Baker, a female born in 1964, worked for GTI at its RISE dispensary location in Steelton from April 25, 2018 (her date of hire) until June 7, 2019 (the date of her constructive discharge).

10.     Prior to working for GTI, Baker earned a master's degree in paralegal studies from George Washington University, a bachelor's degree in criminal justice from Albright College, and an associate degree in computer science from Thompson Institute. After watching her best friend suffer and die from a rare form of cancer, Baker became a strong advocate for medical marijuana legalization in Pennsylvania, and she wrote her graduate school thesis on the topic of aligning state and federal laws relating to the use and sale of medical marijuana. Baker serves as a member of the Steelton Zoning Hearing Board, and her work history includes a variety of both administrative and managerial accomplishments.

11.     Although Baker had applied and interviewed for an Assistant Manager position (salary approx. $50k/yr.), she was hired by GTI to work as a Patient Care Specialist at the Steelton RISE dispensary at an hourly rate of $13.

12.     In the email to Baker extending an offer of employment for the Patient Care Specialist position, GTI stated: "*Everyone that you spoke with walked away*

*with the same feeling; you have the right character, work ethic, intelligence, and passion to take us to the next level[,] and we would be incredibly fortunate to have you on our team.*"

13.    Significantly, as part of the process to apply for, and be awarded, a medical marijuana dispensary permit, applicants (like GTI or its affiliated entities) must submit a copy of their diversity plan for consideration in order to ensure "[t]hat permittees promote the participation of diverse groups in their operations by affording equal access to employment opportunities." 35 P.S. § 10231.615(a)(2).

14.    However, once GTI had obtained its dispensary permit, it quickly began eschewing its previously stated diversity goals. Within its first year of operation, several of GTI's recently hired Pennsylvania-based employees were terminated— either actually (i.e., fired) or constructively (i.e., forced to resign)—including (but not limited to) the following individuals: Nzinga Morris (BIPOC); Kenita Honesty (BIPOC); Kathleen Newcomer (age 60+); and Marica McCarroll (age 50+).

15.    Indeed, early in her employment with GTI, Baker's Store Manager, Tel White ("White"), told her that she did not "fit in with the company culture" because she was not "young and single" like him. According to White, GTI was only looking to hire people like him, who were able to "pick up and leave" on a moment's notice, if necessary.

16.     Thereafter, in or around June 2018, GTI terminated Nzinga Morris (identified *supra*), the individual hired to fill the Assistant Store Manager position for which Baker had previously applied.

17.     Also, in or around June 2018, Baker received her mid-year performance evaluation, wherein she achieved an overall rating of "Exceeds Expectations" and which, notably, included the following overall summary:

> *Carrie has demonstrated to me that she is ready for more responsibility, especially in the areas of administration, reporting, daily operations, and tracking. Carrie is ready for a promotion and our goals for the next 6 months should be to get Carrie into a role of administration management where we can maximize her strong admin skills, ability to perform tasks accurately and improve the operations of RISE Steelton to create a more productive and efficient work environment with improved accuracy and accountability.*

18.     Upon the Assistant Store Manager's termination, White met with Baker and Kevin Thomas ("Thomas"), another Patient Care Specialist at the Steelton RISE dispensary (who was both male and substantially younger than Plaintiff), to inform them that they were both being promoted to "Lead Patient Care Specialist," along with an increase in their hourly rate of pay ($1.50/hr.) and health insurance benefits.

19.     Despite both Baker and Thomas sharing this new "Lead" title, the vast majority of the duties and responsibilities of the position fell to Baker, and Baker alone. In effect, Baker became the *de facto* Assistant Store Manager at the Steelton RISE dispensary—performing all attendant duties and responsibilities (*e.g.*, closing every night, training employees, conducting audits to resolve vault discrepancies,

waiting on patients)—but received only half the compensation that had been paid to the previous (substantially younger) Assistant Store Manager for the same work.

20.     Meanwhile, both White and Thomas rarely assisted with operations, but would routinely make offensive comments regarding sex or sexuality. For example, on the handful of occasions when Thomas assisted customers with their purchases, he would regularly forget to give them their change, prompting White and Thomas to joke that he got "distracted by their boobs." (Both White and Thomas would only come out and assist customers if an attractive female had entered the dispensary.) On various occasions, Thomas would tell others (including patients and co-workers) that he was polyamorous and in an "open marriage." White also told Baker that, when he worked at another dispensary, the female employees came to work without wearing bras "to surprise him."

21.     In late summer/early fall 2018, White informed Baker that he would be moving into another position with GTI, and that, as a result, she would be able to apply for the soon-to-be-open Store Manager and Assistant Store Manager positions. However, just a few weeks later, prior to any formal posting for either position, and before Baker could even apply, White told her that he had promoted Thomas (not Baker) to the new role of "Shift Supervisor" and that an external candidate had been hired for the Store Manager position.

22.     Because Baker (a female in her mid-fifties) was far more qualified than Thomas (a substantially younger male) for this new Shift Supervisor position, she raised her concerns with White and GTI's human resources department, and she filed the PHRC Complaint given the obviously discriminatory nature of the decision.

23.     While GTI ignored Baker's internal complaints, once it became aware that she had filed the PHRC Complaint, the conditions of her employment began to deteriorate irreparably.

24.     For example, in stark contrast to Baker's mid-year evaluation, when the new Store Manager, Chris Rich ("Rich"), completed Baker's year-end performance review in or around December 2018—notably, shortly after being made aware that Baker had filed a PHRC Complaint against GTI—Baker received an overall rating of "Needs Improvement."

25.     To be sure, nothing in the review itself calls into question the quality of Baker's performance. To the contrary, the review repeatedly (perhaps begrudgingly) extols the quality of her work as follows:

    a.    **Re: Quality of Work:** "*Accurate and thorough with tasks and consistent with quality of work. Completes tasks within a reasonable amount of time.*"

    b.    **Re: Dependability:** "*Carrie is an extremely reliable employee and will often go above and beyond when needed. Her attendance is great as well as timeliness.*"

c.   **Re: Role Model:** "*Overall, Carrie exhibits quality work when assigned with tasks. She is reliable and a team player. She does extremely well with patients and has earned their trust.*"

d.   **Re: Initiative & Ownership:** "*Carrie is a go-getter and does not have to be asked to execute any task. She is quick to help those around her and is able to accomplish tasks without direction.*"

e.   **Re: Judgment:** "*Carrie can be trusted to make sound decisions for the company and always has the best interest of the company at heart. She is a team player and extremely compassionate with patients. I would like to see line of leadership drawn a bit clearer.*"

f.   **Re: Engagement:** "*Carrie is extremely motivated to gain more responsibility and seek out new opportunities with GTI. She is willing to work hard to obtain her goals.*"

g.   **Re: Team Fit & Respect:** "*Overall Carrie works very well with []her peers and has gained respect with patients bc of her knowledge, patience, and understanding.*"

26.     Despite these many accolades, the performance review appears to take umbrage with the fact that Baker dared to question the discriminatory nature behind Thomas being selected for the Shift Supervisor position, as she was objectively more qualified for that role, and GTI provided no explanation as to why he was chosen to be promoted over Baker. For example, the review notes: "*At most times, Carrie is moving the team in a positive direction. However, at other times it seems that she may be unhappy with certain aspects of GTI and struggles to communicate these concerns.*" To that end, the review concludes, in part, by stating Baker's "*[p]revious relationship with management may have played a role in some areas that need*

*improvement*" and that Rich "*would like to see her relationship improve with Kevin [Thomas] and move past some of the negative feelings from past management.*"

27.    In essence, Rich chose to discount everything that made Baker a stellar employee and, instead, found fault in Baker's supposed failure in "moving past" the nakedly discriminatory nature of the circumstances surrounding her employment. The retaliation campaign was officially underway, and it continued unabated as the calendar turned to 2019.

28.    Over the course of her thirty-plus years of employment, Baker never once received a single disciplinary write-up. However, after GTI became aware that Baker had filed the PHRC Complaint in late 2018, for the first time in her work life, she began to receive unfair, unfounded, and wholly disproportionate disciplinary actions that had no basis in fact and had nothing to do with the performance of her job duties, but rather, were designed solely to impede her upward progress within the company (similar, in many ways, to the approach taken with respect to Baker's year-end performance evaluation).

29.    For example, in February 2019, Baker applied for a managerial role at another one of GTI's RISE dispensaries located in York, Pennsylvania. In response, Baker was informed that she would first need to become a Shift Supervisor in order to be considered for a managerial role. (Of course, Baker never had the opportunity to apply for the Shift Supervisor position, which did not exist at the time she was

hired and was simply given to Thomas for reasons that Baker (rightly) considered to be discriminatory.)

30.    Just a few days after applying for this position, on or about February 16, 2019, Baker received a disciplinary write-up from Rich—seemingly out of the blue—based on an alleged incident that occurred during closing between Baker and Thomas on January 23, 2019, i.e., more than three weeks before the discipline was actually issued. The incident in question involved a situation wherein Baker stood her ground and confronted Thomas about his harassing behavior and the negative impact it had on her ability to perform her duties in a timely and efficient manner. However, according to the written discipline prepared by Rich, it was Baker, not Thomas, who had engaged in harassing and insubordinate conduct. And yet, despite this, and despite admitting to Baker that she never actually spoke to Thomas about the situation, Rich never gave Baker an opportunity to provide her side of the story before issuing the discipline, which was obviously issued in an attempt to further stymie Baker's opportunities for advancement within the company.

31.    Thomas, for his part, frequently exhibited insubordinate and harassing behavior in the workplace without repercussion or discipline.

32.    Approximately one month later, to add insult to injury, Baker received another written discipline—this time fashioned as a "Final Warning"—for allegedly misusing company time and resources to search for other employment and also based

on alleged complaints that were made by (unidentified) co-workers about Baker's "negative remarks … regarding issues with management, overall satisfaction with your position, as well as issues with your rate of pay."[1]

33.     To be sure, the only time Baker applied for employment opportunities during company time is when she applied for other positions within GTI. Further, with respect to Baker's alleged "negative remarks," it quickly became apparent to Baker (and others) that Rich was using another employee—Chai Kline ("Kline")—to set people up for such discipline. Kline would sigh and say something to the effect of, "I'm so tired of this place." If someone agreed and mentioned any problems they were having, Kline would report what had been said back to Rich. Several employees raised concern about Kline's actions, and when she tried to do something similar to Baker again, Baker would simply respond: "Love the job, hate the chaos."

34.     Beyond discipline, Baker was also intentionally excluded from certain job-related benefits and activities. For example, when other employees received a free product for the holidays, and Baker did not, she was told it was because she was a member of management. (Despite the fact that she could not apply for a managerial position because she was not recognized a member of management.) When Baker

---

[1] While baseless, it is notable that GTI chose to discipline Baker, at least in part, for raising concerns related to management and her rate of pay with her co-workers, in clear violation of Sections 7 and 8(a)(1) of the National Labor Relations Act.

brought this to Rich's attention, Rich relented and provided Baker with the item that had been given to all other employees, stating: "It sucks to be excluded, doesn't it?"

35.     On another occasion, employees from another RISE dispensary were planning to visit the Harrisburg area, and Thomas—despite an established group text with all Steelton employees (including Baker)—sent out a text message to every Steelton employee except for Baker inviting them to meet the other employees. Baker only became aware of this when another Steelton employee responded to the established group text about the event.

36.     Despite the ongoing retaliation from Rich and Thomas, Baker went to work every day and did her best to serve the people of her community. Baker also did whatever she could to build a sense of comradery amongst her co-workers. For example, when Rich suggested that employees each take a day of the week to make lunch for the others, Baker was the only employee who participated, making lunch for everyone every Saturday for a number of weeks.

37.     Baker did everything she could to maintain her employment with GTI, as being in a position to assist others with the legal acquisition and use of medical marijuana was an issue near and dear to her heart. Unfortunately for Baker, however, GTI—through its actions—made clear that her filing of the PHRC Complaint simply would not allow for this to happen.

38.     On June 5, 2019, Rich informed Baker that an "anonymous complaint" was received indicating that Baker was being "negative" and that, as a result, Baker was "under investigation."

39.     Later that night, Baker received a text message from Jessica Leonard, an employee of the Carlisle RISE dispensary, to let Baker know that she had recently been terminated without notice, and the termination papers that were provided to her had Baker's name on them, not hers. Clearly, GTI had made the decision to terminate Baker's employment.

40.     Realizing that there was nothing more she could do to remain employed with GTI in good standing, let alone advance within the company, and given the constant barrage of retaliatory harassment in response to the filing of her PHRC Complaint, Baker had no choice but to terminate her employment with GTI (i.e., constructive discharge).

41.     Accordingly, on the morning of June 7, 2019, Baker sent the following email to Tim Hawkins, GTI's Market President, to notify him of the nature of her constructive discharge:

> *Good morning Tim,*
>
> *Please consider this my resignation from GTI and Rise Dispensary effective immediately. I have been subjected to continued harassment since December when I disclosed to Chris that I had filed a complaint with the Human Relations Commission. The stress of that harassment has made going to work unbearable.*

*Tel White told me that I would never move up at GTI because I didn't fit the "culture." He was right. I have honor, integrity, and a strong work ethic. That doesn't fit the culture of Rise Steelton. Tim, you have some real problems at Rise Steelton and I wasn't one of them. I showed up for work every day and no matter what harassment, verbal abuse, or passive-aggressive comments made by the manager, I put a smile on my face and gave 100% to the patients. I came in on my days off to help patients when they had issues with their card on more than a handful of occasions.*

*Further, I would never risk the program or Rise's license by distributing product from the bathroom as Kevin has (it's on camera) and indicating "there are no cameras in the bathroom." I worked hard and advocated to get this program in Pennsylvania, and something like that could take it down. I don't care what people do, but take it out of the building.*

*Your current manager seems to be having an inappropriate relationship with Chai and gets her to try to set people up by talking negatively about the job, and then when you respond, reporting you for being negative. Eric, Sara and I have all been subjected to that. She tried hard last week, but I, nor Eric, would engage, so Chris then had her complain to the integrity hotline. She has screamed at patients, one Jeremy H. (Sara was a witness) was so distraught. He has severe PTSD and I had to plead with him to come back in. She has fostered a real negative work environment.*

*I will drop off my badge this evening and pick up the contents of my locker. I just have a jacket and some papers in there so if you could have someone put it in a paper bag and leave it for me at the front desk I would appreciate it.*

*Thanks,*

*Carrie Baker*

42.     Upon information and belief, following Baker's constructive discharge,

GTI replaced Baker as Lead Patient Care Specialist with, and/or assigned her duties

and responsibilities to, a substantially younger employee, i.e., someone who GTI felt "fit in with the company culture" more so than she did.

43.     Following her constructive discharge, Baker secured a position with the Pennsylvania Department of Health's medical marijuana division, where she can now devote her time, energy, and attention to this important cause without fear of discrimination, harassment, or retaliation.

## COUNT I
## SEX DISCRIMINATION: FAILURE TO PROMOTE
### (Title VII)

44.     The foregoing paragraphs are incorporated by reference in their entirety as though set forth in full herein.

45.     Title VII makes it unlawful for an employer "to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's … sex … ." 42 U.S.C. § 2000e-2(a).

46.     GTI violated Title VII by intentionally discriminating against Baker, a woman, when it promoted a less qualified male employee (Kevin Thomas) over her for the role of Shift Supervisor, the impact of which severely curtailed any chance she had to move into a managerial role at the company.

47.     The effect of GTI's unlawful employment practices, described more fully herein, was to deprive Baker of equal employment opportunities and otherwise adversely affect her status as an employee because of her sex.

48.     Baker suffered damages as a result of GTI's discrimination, including, but not limited to, emotional distress, humiliation, and embarrassment, past and future lost wages and benefits, and the fees and costs associated with bringing this action.

49.     GTI intentionally violated Baker's rights under Title VII, with malice or reckless indifference, and, as a result, is liable for punitive damages.

**COUNT II**
**SEX DISCRIMINATION: FAILURE TO PROMOTE**
**(PHRA)**

50.     The foregoing paragraphs are incorporated by reference in their entirety as though set forth in full herein.

51.     The PHRA makes it unlawful for an employer, "because of the … sex … of any individual … , … to … discriminate against such individual … with respect to compensation, hire, tenure, terms, conditions or privileges of employment … ." 43 P.S. § 955(a).

52.     GTI's promotion of a male employee over Baker to the position of Shift Supervisor violates the PHRA for all the reasons set forth above and as summarized in Count I.

53.     Baker suffered damages as a result of GTI's discrimination, including, but not limited to, emotional distress, humiliation, and embarrassment, past and

future lost wages and benefits, and the fees and costs associated with bringing this action.

## COUNT III
## AGE DISCRIMINATION: FAILURE TO PROMOTE
## (ADEA)

54.     The foregoing paragraphs are incorporated by reference in their entirety as though set forth in full herein.

55.     The ADEA makes it unlawful for an employer to "discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA also makes it unlawful for an employer "to limit, segregate, or classify [its] employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect h[er] status as an employee, because of such individual's age." Id. § 623(a)(2).

56.     GTI violated the ADEA by intentionally discriminating against Baker, a woman in her mid-fifties, when it promoted a less qualified, substantially younger male employee (Kevin Thomas) over her for the role of Shift Supervisor, the impact of which severely curtailed any chance she had to move into a managerial role at the company.

57.     The effect of GTI's unlawful employment practices, described more fully herein, was to deprive Baker of equal employment opportunities and otherwise adversely affect her status as an employee because of her age.

58.     Baker suffered damages as a result of GTI's discrimination, including, but not limited to, past and future lost wages and benefits, as well as the fees and costs associated with bringing this action.

59.     GTI willfully violated Baker's rights under the ADEA and, as a result, is liable for liquidated damages.

## COUNT IV
## AGE DISCRIMINATION: FAILURE TO PROMOTE
## (PHRA)

60.     The foregoing paragraphs are incorporated by reference in their entirety as though set forth in full herein.

61.     The PHRA makes it unlawful for an employer, "because of the … age … of any individual … , … to … discriminate against such individual … with respect to compensation, hire, tenure, terms, conditions or privileges of employment … ." 43 P.S. § 955(a).

62.     GTI's promotion of a substantially younger (and far less qualified) male employee over Baker to the position of Shift Supervisor violates the PHRA for all the reasons set forth above and as summarized in Count III.

63.     Baker suffered damages as a result of GTI's discrimination, including, but not limited to, emotional distress, humiliation, and embarrassment, past and future lost wages and benefits, and the fees and costs associated with bringing this action.

## COUNT V
## RETALIATORY HARASSMENT/HOSTILE WORK ENVIRONMENT
### (Title VII)

64.     The foregoing paragraphs are incorporated by reference in their entirety as though set forth in full herein.

65.     Title VII makes it unlawful for an employer "to discriminate against any of [its] employees … because [s]he has opposed any practice made an unlawful employment practice by this subchapter … , or because [s]he has … participated in any manner in an investigation … under this subchapter."  42 U.S.C. § 2000e-3(a).

66.     Baker engaged in protected activity when, after being passed over for a promotion for which she was eminently more qualified than the male employee who received it (creating an objectively reasonable belief of sex discrimination), she filed the PHRC Complaint against GTI in or around October 2018.

67.     The retaliatory harassment and/or hostile work environment that Baker was forced to endure while employed by GTI, and which flowed directly from the filing of the PHRC Complaint, was unwelcome, severe or pervasive, and had a

material and detrimental impact on the terms and conditions of her employment. Accordingly, GTI's actions violate Title VII.

68.     Baker made several attempts to address her concerns with members of GTI's management, but rather than work to address these issues, GTI chose instead to discipline Baker for her so-called "negative attitude."

69.     Baker suffered damages as a result of GTI's retaliatory harassment, including, but not limited to, emotional distress, humiliation, and embarrassment, past and future lost wages and benefits, and the fees and costs associated with bringing this action.

70.     GTI intentionally violated Baker's rights under Title VII, with malice or reckless indifference, and, as a result, is liable for punitive damages.

## COUNT VI
## RETALIATORY HARASSMENT/HOSTILE WORK ENVIRONMENT
## (ADEA)

71.     The foregoing paragraphs are incorporated by reference in their entirety as though set forth in full herein.

72.     The ADEA makes it unlawful for an employer "to discriminate against any of [its] employees … because such individual … has opposed any practice made unlawful by this section, or because such individual … has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d).

73.     Baker engaged in protected activity when, after being passed over for a promotion for which she was eminently more qualified than the substantially younger employee who received it (creating an objectively reasonable belief of age discrimination), she filed the PHRC Complaint against GTI in or around October 2018.

74.     The retaliatory harassment and/or hostile work environment that Baker was forced to endure while employed by GTI, and which flowed directly from the filing of the PHRC Complaint, was unwelcome, severe or pervasive, and had a material and detrimental impact on the terms and conditions of her employment. Accordingly, GTI's actions violate the ADEA.

75.     Baker made several attempts to address her concerns with members of GTI's management, but rather than work to address these issues, GTI chose instead to discipline Baker for her so-called "negative attitude."

76.     Baker suffered damages as a result of GTI's retaliatory harassment, including, but not limited to, past and future lost wages and benefits, as well as the fees and costs associated with bringing this action.

77.     GTI willfully violated Baker's rights under the ADEA and, as a result, is liable for liquidated damages.

## COUNT VII
## RETALIATORY HARASSMENT/HOSTILE WORK ENVIRONMENT
## (PHRA)

78.     The foregoing paragraphs are incorporated by reference in their entirety as though set forth in full herein.

79.     The PHRA makes it unlawful for an employer "to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act." 43 P.S. § 955(d).

80.     The retaliatory harassment and/or hostile work environment that Baker was forced to endure while employed by GTI violates the PHRA for all the reasons set forth above and as previously summarized in Counts V and VI.

81.     Baker suffered damages as a result of GTI's retaliatory harassment, including, but not limited to, emotional distress, humiliation, and embarrassment, past and future lost wages and benefits, and the fees and costs associated with bringing this action.

## COUNT VIII
## RETALIATION
## (Title VII)

82.     The foregoing paragraphs are incorporated by reference in their entirety as though set forth in full herein.

83.   Title VII makes it unlawful for an employer "to discriminate against any of [its] employees … because [s]he has opposed any practice made an unlawful employment practice by this subchapter … , or because [s]he has … participated in any manner in an investigation … under this subchapter."  42 U.S.C. § 2000e-3(a).

84.   Baker engaged in protected activity when, after being passed over for a promotion for which she was eminently more qualified than the male employee who received it (creating an objectively reasonable belief of sex discrimination), she filed the PHRC Complaint against GTI in or around October 2018.

85.   Baker's constructive discharge from her employment with GTI on June 7, 2019, was a direct and proximate result of her filing the PHRC Complaint and the culmination of a wide array of retaliatory actions taken against her by GTI.

86.   Baker suffered damages as a result of GTI's retaliation, including, but not limited to, emotional distress, humiliation, and embarrassment, past and future lost wages and benefits, and the fees and costs associated with bringing this action.

87.   GTI intentionally violated Baker's rights under Title VII, with malice or reckless indifference, and, as a result, is liable for punitive damages.

## COUNT IX
## RETALIATION
## (ADEA)

88.   The foregoing paragraphs are incorporated by reference in their entirety as though set forth in full herein.

89.     The ADEA makes it unlawful for an employer "to discriminate against any of [its] employees … because such individual … has opposed any practice made unlawful by this section, or because such individual … has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d).

90.     Baker engaged in protected activity when, after being passed over for a promotion for which she was eminently more qualified than the substantially younger employee who received it (creating an objectively reasonable belief of age discrimination), she filed the PHRC Complaint against GTI in or around October 2018.

91.     Baker's constructive discharge from her employment with GTI on June 7, 2019, was a direct and proximate result of her filing the PHRC Complaint and the culmination of a wide array of retaliatory actions taken against her by GTI.

92.     Baker suffered damages as a result of GTI's retaliation, including, but not limited to, past and future lost wages and benefits, as well as the fees and costs associated with bringing this action.

93.     GTI willfully violated Baker's rights under the ADEA and, as a result, is liable for liquidated damages.

## COUNT X
## RETALIATION
## (PHRA)

94.     The foregoing paragraphs are incorporated by reference in their entirety as though set forth in full herein.

95.     The PHRA makes it unlawful for an employer "to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act." 43 P.S. § 955(d).

96.     GTI's constructive discharge of Baker violates the PHRA for all the reasons set forth above and as previously summarized in Count VIII and IX.

97.     Baker suffered damages as a result of GTI's retaliation, including, but not limited to, emotional distress, humiliation, and embarrassment, past and future lost wages and benefits, and the fees and costs associated with bringing this action.

## COUNT XI
## AGE DISCRIMINATION: CONSTRUCTIVE DISCHARGE
## (ADEA)

98.     The foregoing paragraphs are incorporated by reference in their entirety as though set forth in full herein.

99.     The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to h[er]

compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA also makes it unlawful for an employer "to limit, segregate, or classify [its] employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect h[er] status as an employee, because of such individual's age." Id. § 623(a)(2).

100.   Baker was fifty-five years old and qualified for her position when she was constructively discharged from her employment with GTI on June 7, 2019, in violation of the ADEA.

101.   Upon information and belief, Baker was one of the oldest (if not the oldest) employees working for GTI at the Steelton RISE dispensary at the time of her constructive discharge, and she had been targeted by GTI for dismissal because of her age from nearly the start of her employment in order to make way for younger employees who, as Baker's manager relayed to her early on, were a better "fit" with the "culture" of the company by virtue of their age.

102.   To be sure, other, similarly situated employees who were substantially younger than Baker were not subjected to the same level of scrutiny or discipline as Baker, and they received far more favorable treatment from GTI than did Baker.

103.   Upon information and belief, following Baker's constructive discharge, GTI replaced her as Lead Patient Care Specialist with, and/or assigned her duties

and responsibilities to, one or more substantially younger employee(s), i.e., someone who GTI felt "fit in with the company culture" more so than she did.

104.   Baker suffered damages as a result of GTI's discrimination, including, but not limited to, past and future lost wages and benefits, as well as the fees and costs associated with bringing this action.

105.   GTI willfully violated Baker's rights under the ADEA and, as a result, is liable for liquidated damages.

## COUNT XII
## AGE DISCRIMINATION: CONSTRUCTIVE DISCHARGE
## (PHRA)

106.   The foregoing paragraphs are incorporated by reference in their entirety as though set forth in full herein.

107.   The PHRA makes it unlawful for an employer, "because of the … age … of any individual … , … to discharge from employment such individual … ."  43 P.S. § 955(a).

108.   GTI's constructive discharge of Baker violates the PHRA for all the reasons set forth herein and as previously summarized in Count XI.

109.   Baker suffered damages as a result of GTI's discrimination, including, but not limited to, emotional distress, humiliation, and embarrassment, past and future lost wages and benefits, and the fees and costs associated with bringing this action.

## REQUESTED RELIEF

WHEREFORE, Plaintiff, Carrie Baker, seeks the following relief:

(i)      Economic damages, with interest, necessary and proper to compensate her for the discrimination, harassment, and retaliation described herein, including but not limited to: back pay, front pay, past lost wages, future lost wages, lost pay increases, lost pay incentives, negative tax consequences, and lost benefits;

(ii)     Compensatory damages for past, present, and future physical and mental pain and suffering;

(iii)    Liquidated damages for any amount awarded under the ADEA;

(iv)    Punitive damages;

(v)     Reasonable attorney fees and costs; and

(vi)    Such other relief as is deemed just, proper, and equitable.


Respectfully submitted,

**PILLAR+AUGHT**


By:      /s/ John R. Martin
          John R. Martin, Esq.
          jmartin@pillaraught.com
          Attorney I.D. No. 204125 (PA)
          **Pillar+Aught**
          4201 E. Park Circle
          Harrisburg, PA  17111
          (717) 308-9910 (phone)
          (717) 686-9862 (fax)

          *Attorneys for Plaintiff*

Date: September 22, 2022